731 N.E.2d 982 (2000)
313 Ill. App.3d 890
247 Ill.Dec. 209
In re T.W., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
C.W., Respondent-Appellant).
No. 2-98-1511.
Appellate Court of Illinois, Second District.
June 14, 2000.
*983 Michael J. Calabrese (Court-appointed), Sullivan Taylor, P.C., Wheaton, for C.W. Mother.
Joseph E. Birkett, Du Page County State's Attorney, Wheaton, Martin P. Moltz, Deputy Director, Lawrence M. Bauer, State's Attorneys Appellate Prosecutor, Elgin, for the people.
Justice McLAREN delivered the opinion of the court:
Respondent, C.W., appeals from the trial court's order adjudicating her son, T.W., a neglected minor under section 2-3(1)(a) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3(1)(a) (West 1998)). We reverse.
The State filed its original neglect petition on December 23, 1997, alleging that T.W. was neglected under sections 2-3(1)(a) (lack of proper support, education, or care) and 2-3(1)(b) (environment injurious to the minor's welfare) of the Act. See 705 ILCS 405/2-3(1)(a), (1)(b) (West 1998). C.W. denied the substantive allegations and the allegation that it was in T.W.'s best interest to be made a ward of the court. T.W.'s father neither admitted nor denied the petition.
An adjudicatory hearing was held on May 1, 1998. Eleven exhibits were admitted into evidence by stipulation. These exhibits consisted of a police report and an ambulance report from December 22, 1997, and medical reports from Good Samaritan Hospital regarding C.W.'s hospitalization for pancreatitis on December 22 and 23.
The only testimony presented was that of C.W., who stated that she and T.W. were at home at approximately 7 p.m. on December 22, 1997. C.W. was intoxicated at that time. Kevin Wynard from the Family First social agency stopped by for a visit regarding a prior, unrelated contact. C.W. refused to answer the door because Wynard "had no right" to be at the house. Soon after, Wynard returned with police and paramedics, and C.W. was taken to the hospital. When asked if she thought that she was capable of taking care of T.W. on December 22, 1997, C.W. replied, "Yes I do. I know I was." She also stated that she thought that her consumption of alcohol that day had "[s]omewhat" impaired her ability to be an effective parent in that she "wasn't as quick." However, T.W. had eaten "every two hours" that day. C.W.'s request to be taken to the hospital was not based on her intoxication. No other testimony was given.
The court found the neglect petition proved as to section 2-3(1)(a) (705 ILCS 405/2-3(1)(a) (West 1998)) (lack of proper support, education, or care) but not proved as to section 2-3(1)(b) (705 ILCS 405/2-3(1)(b) (West 1998)) (injurious environment). After a dispositional hearing at which no evidence was taken, the court found that it was in T.W.'s best interest to be adjudicated a neglected minor and that DCFS be named as T.W.'s guardian. C.W.'s motion to reconsider was denied. This appeal followed.
C.W. contends that the court's finding and adjudication of neglect are against the *984 manifest weight of the evidence and must be reversed. We agree.
The State must prove neglect by a preponderance of the evidence. In re M.K., 271 Ill.App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995). Preponderance of the evidence is proof that leads the fact finder to find the existence of the issue in fact is more probable than not. In re C.C., 224 Ill.App.3d 207, 215, 166 Ill.Dec. 540, 586 N.E.2d 498 (1991). A trial court's finding of neglect will be disturbed in this court only when it is against the manifest weight of the evidence. M.K., 271 Ill. App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74. A finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the proper result is the one opposite that reached by the trial court. M.K., 271 Ill.App.3d at 826, 208 Ill.Dec. 242, 649 N.E.2d 74. Cases involving adjudication of neglect are sui generis and ultimately must be decided on the basis of their own particular facts. In re M.B., 241 Ill.App.3d 697, 705, 182 Ill.Dec. 197, 609 N.E.2d 731 (1992).
The trial court found as proved paragraph 3.2 of the neglect petition, which alleged:
"That said minor is a NEGLECTED MINOR as defined by 705 ILCS 405/2-3(1)(a) in that said minor is under the age of 18 whose parent or parents responsible for the minor's welfare does [sic] not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his well-being, including adequate food, clothing and shelter." Our review of the evidence does not disclose that C.W. failed to provide proper or necessary support, education, medical or remedial care, or other care necessary for his well-being, including adequate food, clothing, and shelter. The State's exhibits show that C.W. was alert but confused, highly intoxicated (a blood-alcohol reading of .354 was obtained at the hospital), and uncooperative with authorities on December 22, 1997. However, there is no evidence that C.W. failed to provide the care necessary for T.W.'s well-being. There is no evidence that T.W. was malnourished, sickly, ill-clad, or living in inadequate or filthy housing. Exhibit 1, a sheriff's police report, contained the statement that Kevin Wynard thought that C.W. "was unable to care for her son." However, there is no evidence that T.W. was denied anything vital to his welfare, even if C.W. "wasn't as quick" because she had been drinking.
We believe that a person may be neglectful with a substantially lower blood-alcohol level in his/her body. However, the record must contain evidence that the blood-alcohol level sufficiently affected the respondent so as to cause her to be neglectful, not merely intoxicated. Blood alcohol is a piece of evidence, a factor to be considered with other facts to establish neglect; it does not constitute proof of neglect as alleged in this case.
The State argues that this court should not delay finding a lack of care "until dire consequences occur." This court can only base its decisions on the facts in evidence in the case before it. The State had its opportunity to present evidence of a lack of support for T.W. or to allege and prove neglect under other grounds provided in the Act. The State failed to do either. The trial court's finding and adjudication of neglect were against the manifest weight of the evidence. Therefore, the trial court's judgment must be reversed.
Because of our disposition of this issue, we need not address C.W.'s other contention.
For these reasons, the judgment of the circuit court of Du Page County is reversed.
Reversed.
INGLIS, J., concurs.
*985 Justice GEIGER, dissenting:
I respectfully dissent from the majority's opinion. I believe that the trial court's finding that the neglect petition was proved was not against the manifest weight of the evidence.
The primary consideration in cases involving neglected minors is the best interest and welfare of the child. In re N.S., 255 Ill.App.3d 768, 776, 194 Ill.Dec. 536, 627 N.E.2d 1178 (1994). As the majority correctly notes, we may reverse the trial court's determination only if the record clearly establishes that the opposite result is readily apparent. In re M.K., 271 Ill. App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995). The trial court is afforded broad discretion when determining parental rights and responsibilities due to its opportunity to observe the conduct and demeanor of the parties and witnesses. In re C.C., 224 Ill.App.3d 207, 215, 166 Ill.Dec. 540, 586 N.E.2d 498 (1991). The reviewing court cannot say whether the witnesses are truthful, as the cold record does not reveal the sincerity of a witness and may reveal only the most obvious of contradictions in testimony.
A thorough review of the record reveals that in July 1997 C.W. lost custody of her other children in her divorce proceedings. At about the time that she relinquished custody of her other children to her ex-husband, in August 1997, C.W. admitted herself to a psychiatric hospital for "a nervous breakdown." At that time, she contacted the Department of Children and Family Services (DCFS). Thereafter, Kevin Wynard, a social worker with Family First, began visiting C.W. and T.W. at their home approximately two or three times per week.
On December 22, 1997, Wynard received a phone call from C.W., and she "seemed out of it" according to him. Following the phone call, Wynard went to the home, and C.W. refused to answer the door. After Wynard ultimately gained access to the home, he observed that C.W. "was unable to care for her son" due to her intoxication. C.W. testified that she had consumed a "six-pack" of beer before Wynard arrived. She had not eaten for several days, and her "pancreas" had been upset due to stress. She was supposed to have been taking Paxil and Buspar, which are psychotropic medications, but she had stopped taking them because her public aid had terminated.
Wynard contacted DCFS. DCFS advised that there was an open DCFS case on T.W. and instructed Wynard to take custody of T.W. Wynard also called paramedics.
When the paramedics arrived, they noted that C.W. was "confused" and "slightly combative." They were unable to take C.W.'s blood pressure and lung sounds due to her combativeness. C.W. also showed that she was "hostile by screaming and slapping her hands on her lap."
When C.W. arrived at the emergency room at Good Samaritan Hospital, she continued her combative conduct, and the emergency room nurse threatened to restrain her if she did not cooperate. She was given Librium and Ativan. C.W. advised emergency room personnel that she had vomited as many as 20 times during the day. The nurse also noted that this was the third or fourth occasion on which the paramedics had been called to C.W.'s home for C.W.'s intoxication.
After C.W. accused emergency room personnel of wanting to rape her, she started pacing, while swearing and talking to herself. She then crawled underneath a chair and refused to get up. The emergency room physician diagnosed C.W. with "acute alcoholic pancreatitis," depression, and dehydration. That evening, emergency room personnel completed a petition for involuntary admission because C.W. had refused medical care and was "randomly swinging at staff."
C.W. spent the night in the hospital, and the following day she informed medical personnel that she had been stressed and *986 had consumed brandy and egg nog. At that time, whether she had pancreatitis was questionable, and the reports indicated that it had been resolved. C.W. was released the day after she was admitted.
The trial court found a discrepancy regarding one of the main issues in the case, namely, the suggestion that C.W. abused alcohol. Although C.W. testified that she had consumed a "six-pack" before Wynard arrived, she told hospital personnel that she had consumed brandy and egg nog. This inconsistency is telling, as consuming only six beers is incongruous with a finding of a .354 blood-alcohol content. The trial court was in the best position to determine whether C.W. had been untruthful and, if so, what relevance C.W.'s dishonesty regarding the incident might have in assessing whether C.W. had neglected T.W.
In addition, the trial court made a finding that C.W.'s blood-alcohol content was "close to alcohol poisoning, almost at a lethal level." Just as we do not require jurors to leave their common sense and life experience at the door, we similarly do not require that a trial judge operate in a vacuum when functioning in a factfinding role.
The record reveals that C.W. had appeared in court on this matter on at least three occasions prior to testifying at the adjudicatory hearing. On each occasion, the trial court had the opportunity to observe C.W. We note that, during various proceedings involving C.W., the trial court twice ordered C.W. to submit to a breathalyzer, instanter, because there were indications that C.W. had come to court with an odor of alcohol.
Based on the totality of the evidence in the record, I cannot say that the finding that T.W. had a lack of proper support or care was against the manifest weight of the evidence. The record does not clearly demonstrate that the petition was not proved. I believe the majority has overstepped the deferential review of whether the trial court's finding was against the manifest weight of the evidence. Indeed, the majority has erroneously substituted its judgment for that of the trial court.
I also believe that the majority has employed an improper standard under section 2-3(1)(a) of the Act. The majority makes a finding that the petition for neglect was not proved because "[t]here is no evidence that T.W. was malnourished, sickly, ill-clad, or living in inadequate or filthy housing." Op. at 892, 247 Ill.Dec. at 211, 731 N.E.2d at 984. Contrary to the majority's position, there is no requirement that a minor must be "malnourished, sickly, ill-clad, or living in inadequate or filthy housing" before a neglect petition under section 2-3(1)(a) of the Act may be proved. There is nothing in the case law to support the inference that harm must befall the child before the law will intervene. Indeed, quite the opposite is true.
Section 2-18(2)(f) of the Act provides that "proof that a parent * * * repeatedly used a drug, to the extent that it has or would ordinarily have the effect of producing in the user a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality, shall be prima facie evidence of neglect." 705 ILCS 405/2-18(2)(f) (West 1998). Under section 2-18(2)(f) of the Act, proof of alcohol abuse, with nothing more, can be sufficient to find that a neglect petition has been proved.
In this case, C.W. did not offer any evidence to contradict the reports indicating that the paramedics had been called to her home on three or four occasions because of her intoxication. This fact, coupled with the evidence concerning C.W.'s conduct, may be sufficient prima facie evidence of neglect. In any event, we need not rely solely upon the evidence suggesting that C.W. had repeatedly abused alcohol, causing her to become intoxicated and/or irrational, to find that the neglect petition has been proved. Rather, I believe *987 that a finding of neglect is amply supported by the multitude of evidence that a thorough review of the record would indicate.
The majority views the incident on December 22, 1997, in a vacuum. I do not agree with this approach, as I believe that all the evidence in the record should be considered by the fact finder in determining the welfare of the minor child. As I am concerned with the best interest and welfare of T.W., I would defer to the judgment of the trial court and affirm its order.